May it please the court. My name is John Seidlitz. I have the privilege to be here to represent Deborah Hill this morning. If it's possible, I'd like to reserve five minutes of my time. Deborah Hill is a young woman with an IQ of about 76. I don't know if she appreciates our proceedings here today, but I can assure you I do. Deborah Hill applied for Social Security disability benefits, and she alleged disability in April of 2004. During the period of time up to the hearing, which was held in 2008, she continued to work part-time. Now, under the Social Security rules and regulations, she did not work a sufficient amount or earn a sufficient amount, so as to classify that as work, thus disabling you from Social Security disability benefits. And so if she's disabled just because she's working that amount, that will not disqualify her. Now, the matter was tried before the ALJ and then briefed in front of the federal district court in Montana, and the decision was made that she was not disabled in spite of her impairments. Those impairments, besides her IQ of 76, included diabetes, which ranged out of control due to some problems she had with finances and just being unable to afford the medications, unable to get samples at all of her visits. She suffers from bipolar disorder, mixed personality disorder, and anxiety. Those are the limitations she had. Those limitations interfered with her, even on her job at a store called Dollar Tree. Dollar Tree is one of these stores where everything's a dollar. And she's in there. She's a cashier. She's a stocker. She's putting in four hours a day, up to five days a week. And even with that limited amount of work, she's got supportive help, an employment specialist who comes by to help her. Now, the problems that she has in being able to work is the anxiety affects her in such a manner that she's not able to work. She's not able to deal with customers. She's not able to interact. There are times when the employment specialist would come to the job and see her interacting, see her rocking back and forth, behavior that just is not acceptable to customers or the employer, and she'd have to take her home. Another time she comes in and sees her, and she's just, her mouth is chewing on something. And clearly she's got some kind of medication effect going on. We don't know what it is. What was her pay then? The amount of pay? Yes. You know what? I cannot answer that. I know it's sufficiently low that she would have been below the $960 a month wages that would have classified her as substantial gainful employment. Was the employer, did the government contribute any money towards her pay? I don't believe so. I don't think that's in the record. The only place there may have been some contribution was from this employment support specialist who would interact with her. I don't know if she was a social worker. So I think there was some involvement with government agencies, but I don't think she's on a plan where they pay part of her wages. The ALJ decided against her, found she was not disabled, found that she was able to go back and do something where she wouldn't have to deal with employees or coworkers or the bosses much. And to do that, he was forced to ignore the effects of her medications, which made her sleepy, the fact that prescriptions were not working, the fact that this vocational support specialist had had to come into the job site and remove her from the job site, take her out of there, take her home. One of the things that the ALJ made his decision on, that we argue is air, is he said that her problem is she's, one, either using illicit drugs or, two, not taking her medications. And if she would just avoid illicit drugs or, two, take her medications, she'd be able to work. The record has a reference to a 2005 hospital, I admit, where she had methamphetamine in her system. As far as I know, counsel can correct me. I'm sure he knows the file if I'm wrong. But I think that's the only illicit medication in all the records. Well, her impairments, as I reviewed this, was she has diabetes type 2. Yes. Melitis. Right shoulder injury. She had two surgeries. Back injury. She's bipolar. Yes. Manic depressive. You're not under oath, so you'd say yes. Okay. Anxiety. Panic disorder with agoraphobia. Seizure disorder. Epilepsy. Depression. Is that a fair list of her complaints? Yes. I'm not familiar with the seizure disorder references. And in terms of my review of her problems, she has had shoulder repair, rotator cuff repair, twice on the same shoulder. But I don't know if that was impairing her ability to work. I don't know if that was. Physically, she had some physical problems. Her main limitation from physical problems that I read in the records was she started to suffer from peripheral neuropathy, where your hands and feet go numb from high sugars. And she was having problems with high sugars because she couldn't afford. She was homeless. She couldn't afford the medication. She'd come and see the local health clinic where she could get free care. They would make comments that we have limited samples. We don't even have enough to give her. We're trying to get her on some kind of pharmacy assistance. But the references throughout are that she could not even take her diabetes medication. But that's the physical limitation I saw was mainly with the foot. I don't know if the shoulder was limiting her work. In terms of the limitations, I think it was mainly anxiety, the anxiety, depression, and agoraphobia. She just got to where she couldn't function. I think these times where the support specialist puts in the records, I showed up at work and she's just standing in the aisle rocking back and forth. She got to that point where she just couldn't focus. Now, is that a function of not taking medications? It might be. It might be. But I think it's well briefed that she couldn't take the medications because she didn't have the money. And financial inability to afford medications is prohibited in terms of denying benefits because the medication would have made you better. The second part of the argument I think the ALJ ignored was the treating psychologist, Dr. Mark Mosher. I'm not under oath. He's a great treater. He gets involved and gets her into medications and starts giving her these. And there's nothing in the records to say she's not taking what he's giving her. And he gets in and he adds one. And he adds a second. He adds a third. He adds a fourth. She's on four anxiety medications. And then he has to start bumping them. He adds Seroquel, then increases the Seroquel. The fourth one I'm forgetting right now as I'm looking at you. But then had to increase that. And so over the course of the time, and this is one of the arguments, is that Mosher was ignored by the ALJ because this isn't simply a function of... You're kind of making a jury argument. Tell us where the ALJ went wrong. The ALJ went wrong. You could try to focus your argument a little. The ALJ went wrong in ignoring the treating physician, Dr. Mosher. The ALJ... Physician of the what? Dr. Mark Mosher. Mosher. He was the psychologist. He might have been a psychiatrist, but he was the one involved in prescribing medications for her anxiety. He erred in ignoring that. I think he erred when he said that her problem is that she's not taking medications, and she would be better on medications. And I don't think that's disputable. She would be better on medications, but she could not afford them. There's one reference that ALJ said part of her problem is illicit drugs. There's one time that there's evidence that she was on illegal drugs, 2005. So I think he erred in suggesting that if she were taking the prescriptions, that she would not be disabled when the record is replete with references to the fact the woman's homeless. She doesn't have any money. Yes. Thank you. May it please the Court. David Blower for the Commissioner of Social Security. In this case, there's no dispute that Plano had mental and physical problems that affected her ability to work. The question, however, is whether she was prohibited from performing all work in the national economy. Relevant to the arguments Plano made in his briefs, the ALJ found that Plano's mental impairments limited her to very simple work and to work involving only occasional brief and superficial contact with the public and with coworkers. Let me ask you this. She was suffering from diabetes. Yes, Your Honor. Type 2. Yes. That's more serious than type 1, is it? I'm not sure. I mean, I believe type 1 is typically juvenile diabetes. Type 1 diabetes is typically juvenile diabetes, and type 2 is typically related to your lifestyle, obesity. Well, it's a serious matter. Yes, Your Honor. And she did have two surgeries on her right shoulder. Yes, Your Honor. I believe she tore her rotator cuff. And she did have a back injury. I know she complained of back pain. I'm not sure that there's medical evidence of a back problem. But she complained about it. Yes, she complained of back pain at various points. And she was diagnosed with bipolar disorder. Yes, Your Honor. And she showed symptoms of manic depression, manic depressive symptoms. Yes, I believe that's the bipolar disorder, I believe. She suffered from anxiety attacks. Yes, she was diagnosed with both panic disorder and... And she had suffered from agoraphobia. Yes, she was at one point diagnosed with panic disorder, the agoraphobia, yes. I think panic disorder. Yes, Your Honor. And wasn't there something in the record about her suffering a seizure disorder? I believe before the relevant time period here she was, she did have some seizures. But I don't believe there's any evidence that from 2004 through the ALJ's decision there were any seizures. Mr. Blore, I wonder if I could focus your attention. Oh, I'm sorry, you're not done? No, I shouldn't take a deep breath. And she certainly suffered from depression. Yes, that's correct. So what kind of work would she... You know, one time I had a case that was similar to this. When I was on the district court, I had the person... Well, agoraphobia, I don't like to be around others. I don't like to work at night and had all these symptoms. And so the expert was going to testify as to what type of work was available in the national economy. And so you know what the job was they selected? Night watchman in a mortuary. Okay, I don't know if she could do this. So what work did she do? Well, I mean, interestingly, most of these impairments that she has predate... she had when she was still working as a nurse's aide. She was diagnosed with bipolar disorder and panic disorder in the year 2000. And she was diagnosed with diabetes in 2002. She nevertheless continued to work, you know, 40 or 50 hours a week as a nurse's aide through 2004. And it was only when she tore her rotator cuff that she stopped working. Additionally... I mean, she may have worked as a nurse's aide with those symptoms. But anyway, I don't want to comment on it. I wouldn't want her to be my nurse's aide. That may be fair, but she did work as a nurse's aide, and she was not fired from being a nurse's aide. She only left after she... What work could she do? The vocational expert identified four jobs, office machine operator, mail clerk, photograph processor, and masker. I haven't investigated in great detail what those jobs involve, other than the vocational expert testified she could perform them. What was his name? I'm afraid off the top of my head I don't know his name, Your Honor. I'm sorry. I know that he had, you know, a doctor of education, I believe, in vocational services. And, you know, there's no objection to his testimony at the hearing. Well, was it John Fortune? Yes, it may be Mr. Fortune. That's correct. And when he was asked whether a person with Hill's impairments and frequency of absences would be able to find full-time competitive work, what did he say? When he was posed a vocational... He said no. He said no to me. When he was posed a hypothetical question that matched the residual functional capacity, he identified work. When he was posed with the plaintiff's subjective complaints, he said that she could not work but the ALJ didn't find her subjective complaints to be credible. Well, some people testified that her impairments, particularly her panic attacks and depression, kept her sick three or more times a month. And then Hill was asked, not Hill, I mean, then the expert was asked whether her impairments and the frequency of absences, she would be able to find full-time competitive work. His last answer was no. I think that there's no doubt that if she were absent three times a month, you know, I don't think any vocational expert would identify work she could perform. But I think, to my knowledge, the only basis for that is her own subjective testimony that that's how often she was absent. And the ALJ did not find her to be credible for several different reasons. Well, that's another issue. Yes. So, I mean, you know, when the vocational expert testified in response to a hypothetical question that matched the limitations the ALJ found to be credible, he identified work that she could perform. You know, the ALJ did not find credible her testimony that she was absent three times a month. Well, the hypothetical that was put to the vocational expert, there were certain deficiencies, certain evidence that wasn't included in that hypothetical. Are you referring to Ms. Coffey's opinion, Your Honor? I mean, Ms. Coffey was the treating counselor, and she identified several marked limitations. Well, you know, there was evidence about the frequency and severity of her anxiety and panic attacks. And the ALJ believed that the non-examining medical expert, Dr. Kuka's testimony, that Hill had only two severe panic attacks or manic episodes a year for two or three days. A year, yes. And there was other evidence that came in that was not part of the hypothetical that showed that her loss of days of employment because of these attacks was much more extensive. I mean, I believe that those were hypothetical questions posed by Plaintiff's attorney, and they were not — they were — they must have been based on her subjective complaints. Well, they were based on what was in the evidence. I don't know that there's — I mean, Ms. Mills, the vocational specialist, said that — identified some absences that Plaintiff had in her job as a cashier, but there's sort of — there's no doubt that cashier was a job that was ill-suited to her. She testified at the hearing that she couldn't work more than 15 or 25 hours a week as a cashier because she was dealing with people so much. And as a result, the ALJ took that into consideration and assessed her residual functions. I'm talking about actual attacks that she suffered. There's — It was just out of commission. I believe in the record there are only two instances where there were extended periods of time when she was having problems. She was hospitalized in — Dr. Moser hospitalized her at one point after she had stopped taking Depakote and he couldn't control her mood problems, and so he had her hospitalized so he could put her on a medication regime. And there was a period when she was homeless. Yes, there's evidence that she was homeless, although that was prior to — I believe prior to when she got her job at Dollar Tree. I don't remember the exact years, maybe 2005. All right. Thank you. In this case, the ALJ's residual functional capacity assessment is consistent with most of the medical evidence in the record. Despite Planoff's argument to the contrary, it's consistent with the findings of Dr. Moser and Dr. Urel, her treating psychiatrists. She reported to Dr. Moser that she had anxiety and depression. He diagnosed her with bipolar disorder. Planoff reported to Dr. Urel anxiety, depression, and manic episodes. The ALJ found anxiety and bipolar disorder to be severe impairments and assessed the limitations as a result. So there's no inconsistency that they didn't render an opinion on her functional limitations. The ALJ's residual functional capacity is also consistent with Dr. Lynn Johnson's medical opinion. She said that Planoff would likely need to learn on the job, and that's consistent with the jobs that the ALJ identified, which are unskilled work, which are learned on the job. Dr. Johnson also opined that she didn't — or she reported to Dr. Johnson that she didn't get along well with people. The ALJ took that into consideration and said she could only occasionally, briefly, and superficially interact with people. And finally, Dr. Johnson noted that Planoff's judgment was limited, and the ALJ, again, found unskilled work, which requires little or no judgment. The ALJ did discount Dr. Coffey's opinion. Dr. Coffey was her treating counselor. She's not an acceptable medical source, and so the ALJ need only give germane reasons to discount that opinion. Here, the ALJ found that opinion to be inconsistent with another opinion Ms. Coffey authored, saying that there's no recognizable clinical reason Planoff couldn't return to her work. It was also inconsistent with Ms. Mill's treatment notes. She's the vocational specialist who often reported that Planoff was doing fine at work, routinely reported that Planoff was good with customers, and even though she had a problem with one of her managers, she really found a bond with one of her other managers. The ALJ also reasonably discounted Planoff's subjective complaints, noting that Planoff was working part-time in a job that she was ill-suited to because of contact with people, that she had worked full-time for three years with the same impairments, that she exhibited drug-seeking behavior, seeking both Xanax and narcotics, and that she had made inconsistent statements about her drug use. While there is the 2005 identification that she was admitted with methamphetamine to the hospital, there's also an indication that she reported to treatment providers here in Oregon when she was living here that she had used cocaine in 2006 as well. So this is inconsistent. Was there – this is such a vast record, it's hard to grapple with. Did a vocational expert testify that if a person with her disabilities would have to miss work as often as three or four days a week, she would not be able to sustain competitive full-time employment? I can't identify. Specifically, I think probably a vocational expert would testify that she couldn't work if she missed three or four days a week. I think the benchmark is usually two days a month, excuse me, rather than three or four days a month. So just briefly in conclusion, the ALJ reasonably assessed the residual functional capacity that's consistent with the medical evidence, reasonably discounted plaintiff's subjective complaints and the opinion of Ms. Coffey. And as a result, the Commissioner respectfully requests you affirm its decision. Thank you. Thank you. Any rebuttal? I appreciate the Court's comment on the vastness of the transcript. I was not the attorney on the underlying case. And so when I was contacted and started looking through it and putting the brief together, it's one of the more complicated briefs I've had to put together, and I apologize because there's some typos I know in the briefs, and I do not tolerate those. But those are the transcripts there. Those are the records of the treatment. They're significant. I mean, there's a lot of records. There's a lot of records. And there's some moving around because the client here was homeless. She was out on the coast. She was back in Montana. And then when she's in Montana, she's trying to find a new job and deal with these issues. I think the important thing that we need to realize, you need to start the analysis on this. This lady has come through being homeless, suffering from diabetes. She can't feel her feet. She's doing the CNA work, which is very heavy work. She gets hurt. She doesn't give up. This lady just keeps going. She's doing all she can. She's working four hours a day at the dollar store. It just doesn't get much simpler. Okay? Everything's a dollar. It's not very complicated. But she's doing it. She's going after what she can do. And in spite of that, because she's only working four hours a day, she hasn't got a lot of money. Now, that affects her ability to medicate. And that is one of the things the ALJ errs on, is saying she's not medicating herself. If she'd medicate, she could keep working. No, she can't afford it. One of the things the ALJ ignores, and in terms of recent evidence, Dr. Johnson notes in doing a review for the administration, he goes through, does a lot of tests, does a lot of objective review, and notes his opinion was, the combination of mental and medical problems makes the likelihood of sustained full-time competitive employment unlikely. He's facing a woman in front of him who's working as hard as she can, getting her four hours a day in. And he says that. Full-time is going to be unlikely. Social Security has a review done in-house, a consultive psychologist, Dr. Bettine. Dr. Bettine looks the records over and says, at a minimum, this lady getting back into work is going to require close supervision. Both of those impairments were not presented to the vocational consultant. And the reason those are important, those substantiate Deb Hill's testimony about how often she had anxiety attacks. And when you take Deb Hill's description of her anxiety attacks, and the vocational consultant assumes those as true, he says this lady is not working full-time. She may be working four hours, which she was up until the day of the hearing. As far as I know, the record says she was still working four hours a day. But she's not going to be able to work more than that. She's not going to be able to do substantial gainful employment. The employment specialist does, in fact, note that at times she does well at work. There's no doubt. There were times she did well at work. You know, the stars lined up, the meds were all right. She had all of her meds, and she worked. There's no doubt about that. There are times, though, at work where her behavior required the support, employment support specialist, to come physically take her out of the work. She couldn't get herself home. She couldn't get herself out of the work. And I think the last thing I'd like to comment on is counsel's comment that, you know, she'd been working all this time. She has been working all this time. But one of the things that's happened, and it's noted in the records, Dr. Ural's opinion, her condition with anxiety is getting worse, and they're finding it very difficult to treat it. She's on four medications. They increase them. They keep adjusting them. And in spite of the four medications, they're not able to get this lady over this anxiety so she can function. I appreciate the opportunity. Thank you. Thank you very much. And that will conclude this session of the court.
judges: Goodwin, Pregerson, M Smith, Cjj